UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | | |
|---|---|---|---|
| IN RE: | ) | | |
| | ) | | |
| THE LOUISVILLE ORCHESTRA, INC. | ) | CASE NO. 10-36321 | |
| | ) | CHAPTER 11 | |
| Debtor | ) | | |
| | ) | Electronically filed | |
| _____ | ) | | |

## MEMORANDUM IN SUPPORT OF LOUISVILLE ORCHESTRA MUSICIANS' COMMITTEE'S AND LOUISVILLE ORCHESTRA MUSICIANS' ASSOCIATION MOTION TO DISMISS

** ** **

The Louisville Orchestra Musicians' Association and the Louisville Orchestra Musicians' Committee (individually and collectively, the "Orchestra Musicians"), by counsel, in support of its Motion to Dismiss the Chapter 11 Bankruptcy of the Louisville Orchestra, Inc. ("LOI") states as follows:

## I. THE LOUISVILLE ORCHESTRA, INC.'S PETITION IS FILED IN BAD FAITH FOR THE SOLE PURPOSE OF REFORMING THE COLLECTIVE BARGAINING AGREEMENT WITH THE ORCHESTRA MUSICIANS

This case comes to this Court as nothing more than the LOI attempting to restructure its collective bargaining agreement with the Orchestra Musicians. The current collective bargaining agreement between the Orchestra Musicians and LOI, a true and correct copy of which is attached hereto as **Exhibit A** and incorporated herein by reference, dictates the pay scales and relationship between the parties until May 31, 2011 (the "Agreement"). The Agreement calls for 71 full-time musicians to play for 37 weeks. *See* **Exhibit A**. Based on the terms of the Agreement, the Orchestra

Musicians are due to be paid $101,666.66 every two weeks.[1]  The term of the Agreement ends on May 31, 2011.

Since July of 2010, the LOI has maintained its position that it cannot operate under the terms of the Agreement.  Consequently, since July of 2010, the LOI has consistently sought to renegotiate the terms of the Agreement with the Orchestra Musicians by proposing that the Orchestra Musicians reduce their playing number down to 55 and to play only a 31 week season.  The terms of the proposal are set forth in more detail in the October 26, 2010 letter of Chuck Maisch to the members of the Louisville Orchestra Musicians Committee, a true and correct copy of which is attached hereto as **Exhibit B** and incorporated herein by reference.  The Orchestra Musicians have opposed such proposed change in terms for various reasons, including that it both fundamentally changes the nature of an orchestra which has earned national and international acclaim for Louisville as well as working a crippling hardship on the musicians.

However, in response to the proposed changes in the terms of the Agreement, the Orchestra Musicians arranged for Michael Kaiser to come and advise the orchestra on how to solve any issues it may have as to financing.  Michael Kaiser has been the president of the John F. Kennedy Center for the Performing Arts since 2001 and is creator of "Art in Crisis: A Kennedy Center Initiative", a program to provide free arts management consulting to non-profit performing arts organizations around the United States.  Mr. Kaiser has also authored a book titled "*The Art of Turnaround*" in showing arts organizations how to survive in difficult economic times.  Mr. Kaiser also received his Master's degree in Management from M.I.T.'s Sloan School of Management.  Mr. Kaiser agreed to

---

[1] Counsel for the Orchestra Musicians has not seen a payroll statement.  However, the LOI, in its proposed Order Granting Interim Relief From Collective Bargaining Agreement states that the musicians' current annual approximate wages is $2,440,000.  $2,440,000 divided by 24 bi-weekly payments equates to $101,666.66 every two weeks in musicians' payroll.  However, it is believed that the Orchestra Musicians' actual payroll is more around the $90,000 figure because approximately 6 of the 71 musician positions have not been filled.

come and meet with the LOI and its management at no charge to discuss the alleged financial difficulties it faced.

Despite such offer for Mr. Kaiser to come and advise the orchestra at no charge, the LOI refused the assistance of Mr. Kaiser's services. The LOI wanted to cancel Mr. Kaiser's planned visit until the LOI could exert enough pressure through a bankruptcy that there would be "an agreement among the union and our board (LOI board) for programs and services." Deposition of Rob Birman, the LOI's Chief Executive Officer (hereinafter, "Birman Dep.") Exhibit 43 (attached as **Exhibit C**).

What the Orchestra Musicians had not realized was that the LOI did not want Michael Kaiser to come because it had already decided to file for Chapter 11 bankruptcy. Unbeknownst to the Orchestra Musicians, on or about November 12, 2010, as a result of the Orchestra Musicians denying the LOI's proposed changes to the terms of the Agreement, the Board of the Directors of the LOI voted to approve the LOI to file for bankruptcy. *See* Deposition of Chuck Maisch, President of the Board of Directors of the LOI (hereinafter "Maisch Dep.") pp. 30-33. What is disturbing about that vote is that the LOI bankruptcy planning never even considered anything other than a complete suspension of payment obligations under the CBA.

> Thurman Senn: Was any proposal considered by the board other than a complete suspension of payment obligations under the CBA? I can give you an example without limiting it. Things such as a smaller orchestra, canceling only some events, reducing payments by a certain percentage. Were there other options considered by the board other than completely being relieved of all payment obligations?

> Chuck Maisch: No.

Consequently, it is clear that the LOI Board did not consider alternatives to a 120-day shut down of the orchestra. Moreover, it is also clear that since the LOI did not get its way in trying to re-negotiate the terms of the Agreement, it just decided to make a power play against the Orchestra Musicians by filing for Chapter 11 bankruptcy. This Chapter 11 bankruptcy was intended as

nothing more than a means of locking out the Orchestra Musicians until the Orchestra Musicians would agree to proposed changes in the terms of the Agreement.

Such intent to hold out the Orchestra Musicians is clearly seen through the Minutes of Meeting of Board of Directors of the Louisville Orchestra Foundation, Inc. of November 9, 2010, a true and correct copy of which is attached hereto as **Exhibit D** and incorporated herein by reference. Said minutes expressly state the intention of the LOI to lock out the musicians in stating:

> Rob Birman gave an update of significant changes happening at the Louisville Orchestra, Inc ("LOI"). Specifically, Rob relayed that the LOI has been negotiating with the players union since July to modify the current contract with respect to reducing the total number of salaried players from 71 to 55. The players union has refused to budge on this issue. The LOI has been unsuccessful in raising significant donations and no bequests have materialized. On top of that, tickets sales have not increased with the combined effect leaving the LOI without ongoing operating funds and facing ongoing deficits. Based on the foregoing, Rob relayed that the LOI intents to file for Chapter 11 reorganization effective the end of November. **The good news is that the LOI has little debt and has reduced its fixed operating expenses to where it can operate on only $200,000 through May 11, positioning the LOI to effectively "hold out" in achieving its new, target 55 player LOI organization.**

*See* Exhibit D, emphasis added.

Consequently, there is no question that the LOI is using its Chapter 11 filing as a means of "holding out" the Orchestra Musicians and forcing them to renegotiate the terms of the Agreement. Such actions are expressly prohibited by the terms of the Bankruptcy Code.

A Chapter 11 bankruptcy may not be filed solely for the modifying the terms of a contract or collective bargaining agreement. "It perverts the wholesome economic objective of Chapter 11 from an instrument for the rehabilitation of troubled businesses, to one nakedly to allow the remaking of a bilateral contract by one of the parties thereto." *In re Albrechts Ohio Inns, Inc.*, 152 B.R. 496, 501 (Bankr. W.D. Ohio 1993) citing *In re Woolley's Parkway Center, Inc.*, 147 B.r. 996 (Bankr. M.D. Fla. 1992). "It is not true that solvent debtors may petition for bankruptcy and then obtain a windfall by rejecting their executory contracts." *In re Florence Chi-Feng Huang*, 23 B.R. 798, 803 (9th Cir.

BAP, 1982). "The Bankruptcy Code is not intended to insulate financially secure sellers or buyers from the bargain they strike." *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1028 (11th Cir. 1989). "A solvent debtor-in-possession should not be permitted to remain in bankruptcy for the sole purpose of being able to use the strong-arm clause of the Bankruptcy Code to strike down a bilateral contract to the detriment of its only remaining non-insider creditor." *Dunes Hotel Assoc. v. Hyatt Corp.*, 245 B.R. 492, 507 (Bankr. D. S.C. 2000). Even Congress, in its review in enacting section 1113 stated, "It was also our understanding that a chapter 11 reorganization case that is brought for the sole purpose of repudiating or modifying a collective bargaining agreement is a case brought in "bad faith." 10 Norton Bank. L. & Prac. 3d, 11 U.S.C. § 1113, October 2010. Such a purpose also constitutes "cause" for dismissal of a Chapter 11 under 11 U.S.C. §1112.

As seen by the facts presented above, there is no question that this Chapter 11 bankruptcy was filed for no other reason than to "hold out" or "lock out" the Orchestra Musicians because the LOI was unsuccessful in attempting to force the Orchestra Musicians to accept terms different than those contained in the Agreement. The LOI does not belong in bankruptcy as it has little to no debt, and is using the Bankruptcy Code solely as a means of trying to renegotiate the Agreement. Such action is strictly prohibited under the Bankruptcy Code. The LOI has made every effort to force the Orchestra Musicians to accept different terms by refusing to consider alternatives to shutting down the Orchestra and refusing Michael Kaiser's free assistance. The LOI's only goal is to lock out the Orchestra Musicians until they accept a unilateral agreement proposed by the LOI. Even worse, the LOI is using Chapter 11 bankruptcy as the mechanism to achieve that objective. Such action cannot be tolerated. As a matter of law, the LOI's Chapter 11 bankruptcy must be dismissed.

## II. THE LOUISVILLE ORCHESTRA, INC.'S PETITION IS FILED IN BAD FAITH BECAUSE IT HAS MILLIONS OF DOLLARS IN ASSETS

The Orchestra Musicians fully anticipate that the LOI's defense will be to claim poverty – that it has no money. Yet the LOI's May 31, 2010, audited financial statements show it having "Investments, at fair value" of $8,928,465." See Audited Consolidated Financial Statements prepared by Strothman & Company, P.S.C. for May 31, 2010 (selected pages) (attached hereto as **Exhibit E** and incorporated herein by reference). Investment reports produced during Bankruptcy Rule 2004 examinations of the Debtor reflect investment balances as of November 30, 2010 of $8,882,667 as follows:

| | | |
|---|---|---|
| Morgan Stanley Smith Barney: | $6,586,731 | [**Exhibit F**] |
| PNC Institutional Investments: | $1,287,263 | [**Exhibit G**] |
| Mainstream Investment Advisors, LLC | $1,008,673 | [**Exhibit H**] |
| TOTAL: | $8,882,667 | |

As one Board member wrote in an email to the Debtor's Executive Director sent the day after the LOI's bankruptcy petition was filed – the "elephant in the room is the explanation of the endowment money." See Email, Sue Russell, Chair of the LOI's Board of Overseers to Robert Birman, LOI's CEO (emphasis added) (Dep. Exh. 45) [**Exhibit I**].

Not only does the LOI have these investments, the Orchestra Musicians' preliminary investigation reveals that the LOI has additional resources. For example, the LOI has 32 endowed musician chairs. See Chart "Louisville Orchestra Endowed Chairs" [**Exhibit J**]. One of those chairs – the Alvis R. Hambrick Chair for the LOI's piccolo player – is endowed by the donation to the LOI of a fully-paid whole life insurance policy with a cash value of approximately $350,000. See Affidavit of Donald Gottlieb ¶3 [**Exhibit K**]. This insurance policy is under the control of the LOI,

and its cash value is accessible. Id. No mention of this asset (or potentially other assets like it) is made by the LOI in its motion with the Bankruptcy Court for interim relief from the Agreement.[2]

As explained more fully herein, under Kentucky law and federal bankruptcy law, bona fide creditors of the LOI cannot be denied access to this money. Indeed, the core of this motion is the impropriety (and irony) of the LOI requesting this Court to approve stopping orchestral events for 120 days and laying off 65 musicians when the LOI has 32 endowed musical positions and investments of almost $9 million dollars.

### A. Where Did This Money Come From?

The LOI's brokerage investment accounts are the result of the LOI's various fundraising efforts over the years. As explained more fully herein, the LOI manipulates the terms of access to these funds as it sees fit, and has used these funds to cover extraordinary situations (including a special release of $100,000 to settle the last contract dispute with the LOI's musicians in 2006).

The LOI will have its 75th anniversary this year, and tracing its fundraising efforts through such a long period is of some complexity. So far, counsel for the Orchestra Musicians have uncovered the following:

### 1. The Louisville Orchestra Foundation, Inc.

The bulk, but not all, of the LOI's assets are currently held in accounts in the name of the "Louisville Orchestra Foundation, Inc." (the "LOF").

The LOF has no paid employees. Its records and administrative work are handled by Tonya McSorley, the LOI's Chief Financial Officer. *See* Birman Dep. at p. 83. When the LOI receives a

---

[2]At the LOI's request, the LOI has been granted an extension of time to file its bankruptcy schedules until after the December 28, 2010, hearing on the LOI's motion for interim relief from the Agreement. Accordingly, the Court (and the Orchestra Musicians) does not have the benefit of sworn schedules listing the LOI's assets.

donation, it first deposits the sums into the LOI's checking account, and then decides whether or not it needs to send the money to the LOF. *See* Birman Dep. at 81-82.

Article II(a)[1] of the LOF's Articles of Incorporation (the "LOF Articles") (copy attached at **Exhibit L**) state that "Any provisions of these Articles to the contrary notwithstanding, <u>the Corporation [LOF] shall be operated exclusively for the benefit of LOI, as contemplated by Treas. Reg. Section §1.509()a)-4(c), and distributions or payment by the Corporation [LOF] shall be made only to or for the benefit of LOI</u>." (emphasis added).

The LOF was incorporated on May 21, 2004, as part of the settlement of a lawsuit between the Debtor and the Community Foundation Of Louisville, Inc. (the "Community Foundation") filed in 2002. A Certified Copy Of Record of that lawsuit – <u>Community Foundation Of Louisville, Inc. v. Louisville Orchestra, Inc.</u>, Jefferson Circuit Court, Division 13, No. 02-CI-04737 (the "Community Foundation Lawsuit") is attached hereto as **Exhibit M**.

According to the Complaint of the Community Foundation, in 1988 the LOI entered into an agreement with the Community Foundation to establish the "Louisville Orchestra 1988 Endowment". This 1988 agreement was then replaced by a second agreement in 1992. The Complaint includes a chart listing distributions from the Community Foundation to the LOI for the years 1993 through 2002. The amounts range from a low of $363,256 in 1995 to a high of $1,024,932 in 2000. The chart indicates that the "Distribution Percentage" ranged from 5% to 10% of the balance of the funds then available. In Paragraph 13 of the Community Foundation's Complaint, the Community Foundation acknowledged that the distributions in fiscal years 2001 and 2002 were "in excess of those called for by the 1992 Agreement" and were made "upon direct request from the Louisville Orchestra." According to the records of the Community Foundation Lawsuit, the formula called for total distributions of $812,841.53 in those two years, but the actual amount distributed was $1,680,037.

In the Community Foundation Lawsuit, the LOI filed a counterclaim alleging that the "Orchestra placed the Fund with CFL to invest and manage the Fund for the benefit of the Orchestra. Orchestra never intended to, and never did, transfer title or other ownership of the Fund to CFL." *See* Counterclaim of LOI ¶3.

Without there being a ruling by the Jefferson Circuit Court, the LOI and the Community Foundation settled their lawsuit by entering into a Memorandum Of Understanding dated October 21, 2003 (the "MOU"). *See* Depostion of Tonya McSorley, the LOI's Chief Financial Officers (hereinafter "McSorley Dep.") pp. 83-84 and Dep. Exh. 26 (copy attached hereto as **Exhibit N**). In the MOU, the parties agreed to create the LOI and deposit with it the "amount in controversy in the Lawsuit".

Under Article VI of the LOF Articles, the LOF is managed by a Board of Directors. The Directors are nominated by the Community Foundation, but the LOI may reject a nominee and any nominee must be approved by the LOI's Board. If the Community Foundation does not submit a nomination, the LOI may make the nomination.

Article II(a)[2] of the LOF's Articles specify how the LOF's assets will be distributed. Under Article 11(a)[2](i) as originally recorded, the LOF makes annual distributions on July 1 of each year of 6% of a rolling average of the LOF's investments. This percentage was reduced to 5% by an amendment to the Articles in 2006. Furthermore, in 2010, at the LOI's request, the distribution date was changed from July 1 to May without any formal amendment of the LOF's Articles. *See* Maisch Dep. Exhibit 6 [**Exhibit O** hereto].

In addition to these 6% (now 5%) annual distributions, Article II(a)([2](ii) authorizes the LOF to make additional distributions or guarantee a loan to the LOI upon a majority vote of at least four LOF Board members. Such a distribution was made in the amount of $100,000 in 2006 to settle a collective bargaining dispute with the musicians. *See* Maisch Dep. at pp. 93-94; Dep. Exh. 27.

In addition, Article II(a)[2](iii) sets a "floor" of $8.1 million below which the LOF's assets may not fall. Interestingly, in the 2003 MOU, this floor was set at $7.5 million.[3]

The LOI receives reports specifying internal "allocations" of the assets invested in the name of the LOF. The most recent such allocation available to the Orchestra Musicians is dated as of 9/30/10 and recites that $7,512,165 is allocated to "Louisville Orchestra Fnd", $225,127" is allocated to "Fifth Third" and $375,450 is allocated to "Capital Campaign". [**Exhibit P**]

## 2. The "Fifth Third Bank" Allocation.

The LOI's CFO testified that from 1997 through 2003, the LOI elected not to deposit newly raised endowment funds with the Community Foundation. Instead, those funds were deposited in an account at Fifth Third Bank. *See* McSorley Dep. p. 100. Then, in 2007, the LOI transferred these funds from the Fifth Third Bank account in its name to the LOF. In 2007, this amount transferred was approximately $250,000 *Id. See also* Audited Consolidated Financial Statements prepared by Strothman & Company, P.S.C. for May 31, 2007 (selected pages) at p. 13 (McSorley Dep. Exh. 5 (attached hereto as **Exhibit Q**). The reasons for this transfer in 2007 have not been fully explained, but the net result is that the Orchestra Musicians believe the LOI claims it has now relinquished control of these sums.

## 3. The 2007 Capital Campaign Funds.

In 2007, the LOI started a capital campaign. As it receives those funds, it deposits them in its account and then decides whether they are to be spent on operating expenses or sent to the LOF. However, if the LOI really wants to spend the money on operating expenses, it contacts the donor and requests that permission. *See* Email from Robert Birman (4/14/10) (Dep. Exh. 30) (**Exhibit R**);

---

[3]Article II(a)(2)(iv] purports to permit the LOF to refuse to make distributions if the LOI "has filed for bankruptcy or ceases to provide regular performances of classical music." The Orchestra

Email from Linda Wardell (7/21/10) (Dep. Exh. 33) (**Exhibit S**). The LOI's CEO also testified that a $500,000 NEA grant originally designated as restricted was changed to unrestricted at the LOI's request. *See* Birman Dep. at pp. 39-40. Whether or not campaign funds are restricted or unrestricted is so confusing that the LOI and the LOF were unclear about "several hundred thousand dollar" in sums that may or may not be donor restricted. *See* Email from LOI's auditors to McSorley (05/03/10) (Dep. Exh. 32) (**Exhibit T**).

### 4. Endowed Chairs.

The LOI touts to the world that it has 32 endowed musician chairs. The details of all of those endowments is unclear. What the Orchestra Musicians do know are three things. First, the reports on the allocation of the LOF assets do not address funding for endowed chairs. Second, one of the endowed chairs – the Alvis R. Hambrick Chair for the LOI's piccolo player – is endowed by the donation to the LOI of a fully-paid whole life insurance policy with a cash value of approximately $350,000. See Affidavit of Donald Gottlieb ¶3 [**Exhibit U**]. This insurance policy is under the control of the LOI, is not controlled by the LOF, and its cash value is accessible. Id. Third, it makes absolutely no legal or business sense to the Orchestra Musicians for the LOI to request this Court's permission that endowed musicians not play during the remainder of their Agreement when the LOF has millions in assets (much of which must come from chair endowment funds).

### 5. The Matching Endowment Fund.

According to the LOI's CFO, the "Matching Endowment Fund" was the result of a fundraising campaign in 1967 where the Ford Motor Company (possibly the Ford Foundation) agreed to match contributions. *See* McSorley Dep. at p. 115. In 1999, an "Amended And Restatement Louisville Orchestra, Inc. (Louisville Philharmonic Society) Endowment Trust Fund

---

Musicians contend that the bankruptcy restriction is prohibited by Code §541(c)(1).

Agreement" was drafted. *Id*. (Dep. Exh. 35) (the "1999 Matching Trust"). The University of Louisville approved the restatement as a contingent beneficiary. Counsel for the Orchestra Musicians do not, at this time, fully understand the terms of any restrictions on such trust prior to 1999. In the 1999 Matching Trust, the LOI is identified as both the "Settlor" and the "Beneficiary". Under Article 2.1, there is an annual distribution of net income and net appreciation may also be distributed so long as the balance of the fund does not fall below the "fair market value of the assets in the Fund, as of the time such assets were initial contributed" and the amount of further additions to the Fund.

Under Article 2.5, the trustees of the 1999 Matching Trust "may, by two-thirds vote, with the written consent of the Board of Directors [of the LOI], amend the terms of this instrument from time to time solely to enable the Trustees to carry out the purposes of the Fund more effectively, whenever in the Trustees' opinion such an amendment is necessary or advisable;…."

Under Article 3.1, all of the trustees "must at the time of such appointment be a voting member of the Board of Directors of the Orchestra." If there is a vacancy, the vacancy is filled by "the Board of Directors of the Orchestra."

The assets of the 1999 Matching Trust are invested in an account managed by PNC Institutional Investment which had a balance on November 30, 2010, of $1,304,197. *See* **Exhibit G** (Dep. Exh. 11). This account statement is mailed to "Louisville Orchestra, Inc. Attn Tonya McSorley". The account statement is captioned "Lou Philharmonic Society TUA <u>Revocable</u> Charitable Trust" (emphasis added). The Orchestra Musicians would wonder why the LOI's Board has not requested that the 1999 Matching Trust not be amended to save the remainder of the FY 2010-2011 season, except Part I of this memorandum shows the LOI's true purpose is to put at risk the remainder of the season in order to pressure the Orchestra Musicians to consent to a modification of the Agreement.

### B. General Rules About The Ability Of A Debtor To Shelter His Assets From Creditors.

As a general rule, under Bankruptcy Code §541(a), the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case" except as the further provisions of §541 limit the scope of this general rule. Where "beneficial interest of a debtor in a trust" is involved, Code §541(c)(2) requires that any "restriction on the transfer" of that interest must be "enforceable under applicable nonbankruptcy law." Furthermore, Code §541(c)(1)(A) invalidates provisions in agreements or other legal documents which purport to "terminat[e] .. the debtor's interest in property" on account of "the commencement of a case under" the federal Bankruptcy Code.

Under Kentucky law, KRS 381.180(1) sets forth the general rule that all of a debtor's property, of any kind or nature held in any type of trust, is available to pay its creditors. The statute provides:

> (1) Estates of every kind held or possessed in trust shall be subject to the debts and charges of the beneficiaries thereof the same as if the beneficiaries also owned the similar legal interest in the property, unless the trust is a spendthrift trust.

This rule is based upon the recognition that "[i]t is opposed to a wise public policy that a man should have an estate to live on, but not an estate to pay his debts with, or that he should possess the benefits of wealth without the responsibilities." *Fidelity Trust & Safety Vault Co. v. Walker*, 76 S.W. 131, 134 (1903).

Even if the trust is a spendthrift trust, KRS 381.180(6) and KRS 381.180(7) provides that it can be reached by creditors in certain circumstances as follows:

> (6) Although a trust is a spendthrift trust, the interest of the beneficiary shall be subject to the satisfaction of an enforceable claim against the beneficiary:
> > (a) By the spouse or child of the beneficiary for support, or by the spouse for maintenance;

> (b) If the trust is not a trust described in subsection (7)(b) of this section <u>by providers of necessary services rendered to the beneficiary or necessary supplies furnished to him</u>; and
>
> (c) By the United States or the Commonwealth of Kentucky for taxes due from him on account of his interest in the trust or the income therefrom.
>
> (7) (a) <u>If a person creates for his own benefit a trust with a provision restraining the voluntary or involuntary alienation of his interest, his interest nevertheless shall be subject to alienation by operation of law or legal process.</u>
>
> (b) This subsection shall not be construed to subject to alienation any interest in an individual retirement account or annuity, tax sheltered annuity, simplified employee pension, pension, profit-sharing, stock bonus, or other retirement plan described in the Internal Revenue Code of 1986, as amended, which qualifies for the deferral of current income tax until the date benefits are distributed. [Emphasis added]

The statutory exceptions even to a spendthrift trust have been established because "these creatures [spendthrift trusts] tend to beget idleness and irresponsibility <u>and to shelter fraud</u>…" *Fidelity Trust & Safety Vault Co. v. Walker*, 76 S.W. 131, 134 (1903) (emphasis added).

In this case, the exceptions in both KRS 381.180(6)[4] and KRS 381.180(7)(a) apply.

- KRS 381.180(6) applies because the services of the Orchestra Musicians are "providers of necessary services rendered to the beneficiary."

- KRS 381.180(7)(a) applies because the LOI created the LOF in 2006, controls the election of its Board of Directors, provides its staff, and reports the LOF's assets as part of its audited financial reports.

---

[4] The statutory exceptions in KRS 381.180(6) are extremely similar to the common law exceptions for access to a support trust recognized by the <u>Restatement (Second) of Trusts</u> §157 which states:

> Although a trust is … a trust for support, the trust of the beneficiary can be reached in satisfaction of an enforceable claim against the beneficiary,
> (a) by the wife or child of the beneficiary for support, or by the wife for alimony;
> (b) <u>for necessary services rendered to the beneficiary or necessary supplies furnished to him</u>;
> (c) <u>for services rendered and materials furnished which preserve or benefit the interest of the beneficiary</u>;
> (d) by the United States or a State to satisfy a claim against beneficiary. [Emphasis added].

In addition to the provisions of KRS 381.180(6), the Orchestra Musicians contend that the attempts by the LOI to structure the LOF (or any other mechanism for holding LOI assets) in a manner that prevents the LOI's creditors from being paid is an invalid fraudulent conveyance. In Kentucky, an insolvent debtor cannot transfer valuable property in such a manner that the legitimate rights of the debtor's creditors are defeated. Such a transfer is a "fraudulent conveyance" which is void both by statute and by common law. See generally, KRS 378.010; KRS 378.020; Graham's Adm'r v. English, 169 Ky. 375, 169 S.W. 836, 839 (1914) ("The indebted father has, however, no right to give away his property to the detriment of his creditors….").

The Orchestra Musicians expect that the LOI may argue that LOF was created by a contribution of funds from the Community Foundation which, under Article X of the LOF Articles, has a reversionary interest in certain of the funds in the event of a dissolution of the LOF. However, the LOI is not seeking a dissolution at this time. Moreover, the funds that the Community Foundation contributed were funds it had received from the LOI previously and which the LOI sued claiming were not the Community Foundation. Furthermore, the sum that would be distributed upon the LOF dissolution is "Net Assets" which is defined in Article X as sums "after paying or making adequate provision for the payment of all liabilities of the Corporation" and the Orchestra Musicians would contend that such liabilities include all valid debts of the LOI. *See also In re Spenlinhauer*, 193 B.R. 543 (D. Maine 1996), *aff'd*, 101 F.3d 106 (1st Cir. 1996) (affirming decision of bankruptcy court to pierce alleged spendthrift trust relying upon common law equivalent to KRS 187.180(7) even though debtor was not the sole settler or the sole beneficiary).[5]

---

[5] The Orchestra Musicians expect that the LOI may also argue that the LOF is not a "trust" but a non-profit corporation under KRS Chapter 273. However, KRS 273.247(1)(c) specifies that provisions of a non-profit's articles of incorporation may not be "inconsistent with law". The Orchestra Musicians contend that the LOF's articles of incorporation are inconsistent with law because the restrictions on use of funds improperly harm the creditors of the beneficiary, the LOI. The restrictions on distributions have the effect of "delay[ing], hinder[ing] or defraud[ing] creditors"

In addition, the Orchestra Musician expect that the LOI may argue that it is protected by the recently enacted Kentucky Uniform Prudent Management Of Institutional Funds Act, KRS 273.600 – KRS 273.645 (the "Institutional Funds Act"), which became law on July 15, 2010. However, KRS 273.600(2) expressly provides that the term "endowment fund" "does not include assets that an institution designates for its own use." This would exclude the LOF funds since the LOF was created by the LOI and the deposits in the LOF come from the LOI. In addition, since the LOF was created in 2004, the proper characterization of the assets deposited at that time or any time prior to July 15, 2010, are excluded from the Institutional Funds Act by KRS 273.630 which provides that the law "govern only decisions made or actions taken on or after that date [July 15, 2010, when the law took effect]. Furthermore, the Institutional Funds Act did not repeal KRS 381.180. Even if the Institutional Funds Act did apply, KRS 273.620(2) and .620(3) permits a court to modify the terms and restrictions on the fund when doing so "will further the purposes of the fund" or when the restriction "becomes unlawful, impracticable, impossible to achieve, or wasteful". In this case, canceling the remainder of the season because of the LOI's self-imposed restrictions on the funds in the LOF would clearly meet such tests.

The critical fact is that the LOI never covers its expenses from earned revenue. As the LOI's CEO explained, only "a third" of necessary revenue comes from "earned revenue". See Birman Dep. at pp. 11-12. The remainder has to come from "contributions and grants". Id. As Mr. Birman recognized "there's constant work to raise the funds in addition to earned revenue to pay the bills." Id. at p. 12. In other words, like most non-profits, the LOI is functionally insolvent without donations. Nevertheless, the LOI has attempted to create the fiction that its investments cannot be

_____

because the Community Foundation and the LOI knew that the LOI has never been able to pay its bills solely from earned income. Thus, the restrictions would be prohibited by KRS 378.010 (invalidating fraudulent conveyances) as well as the provisions of and policies behind KRS 381.180.

accessed to pay its legitimate bills, bills which never can be covered in full by ticket sales and earned revenue.

The Orchestra Musicians intentionally use the term "fiction" for several reasons:

- First, in 2001 and 2002, the Community Foundation distributed to the LOI sums in excess of that called for in agreements with the LOI because the LOI demanded it. Then, when the Community Foundation attempted to restrict the LOI's use of the money, a lawsuit ensued in which the LOI filed a counterclaim denying any ability of the Community Foundation to limit how the LOI used its investment assets.

- Second, the LOI and the Community Foundation entered into a MOU specifying a 6% annual distribution amount, but this 6% was reduced to 5% when the LOI wanted the reduction. *See* Articles of Amendment Of The Articles Of Incorporation Of The Louisville Orchestra Foundation, Inc. (part of **Exhibit Z**).

- Third, under Article XII, the LOF Articles can be amended at any time upon agreement of the Boards of the LOI and the Community Foundation, so any restrictions on distributions can be eliminated.

- Fourth, in 2006, when the LOI wanted sums to resolve its dispute at that time with its musician, the LOI was able to secure a $100,000 distribution from the LOF.

- Fifth, the LOI regularly recharacterizes whether its investment assets are restricted or unrestricted. Moreover, the LOI first deposits all donations into its own operating account and then decides whether or not it needs to send the funds to the LOF.

- Sixth, in 2010, when the LOI wanted its annual distribution moved from July to May, the LOI complied.

- Seventh, the LOI is paying the bills it considers important despite claims of no assets. It is able to access donations when it needs them (such as a donation from the Fund for the Arts to pay its legal expenses in this bankruptcy) (Birman Dep. at 32-33). It is improperly choosing to single out the Orchestra Musicians as the targets of its claim of poverty.

In sum, the LOI has millions in assets dedicated to its benefit, and it cannot claim poverty as the real justification for its Chapter 11 filing.

## CONCLUSION

This case comes to this Court as nothing more than the LOI attempting to restructure its collective bargaining agreement before it expires by the pressure of a bankruptcy filing. Those efforts are an improper use of this proceeding, and the LOI's bankruptcy petition should be dismissed for good cause.

Respectfully submitted,

MORGAN & POTTINGER, P.S.C.

By:   /s/ Timothy Schenk_____
    Timothy Schenk
    M. Thurman Senn
    J. Morgan McGarvey
    601 West Main Street
    Louisville, Kentucky 40202
    (502) 589-2780
    mts@morganandpottinger.com
    *Counsel for Louisville Orchestra Musicians'*
    *Association and Louisville Orchestra Musicians'*
    *Committee*

## Certificate Of Service

I hereby certify that this Objection and tendered Order were mailed, first class and postage pre-paid, this 26th day of December, 2010, to all those to whom notice is not electronically mailed by the Court, as indicated on the Court's Notice of Electronic Filing.

       s/ Timothy A. Schenk_____
        Timothy A. Schenk