UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THE LOUISVILLE ORCHESTRA, INC. | ) | CASE NO. 10-36321 |
| | ) | CHAPTER 11 |
| Debtor | ) | |
| | ) | Electronically filed |
| _____ | ) | |

\* \* \* \*\*\* \*\*\* \*\*\*

The Louisville Orchestra Musicians' Association and the Louisville Orchestra Musicians' Committee (individually and collectively, the "Orchestra Musicians"), by counsel, hereby object to approval of the Debtor' Disclosure Statement on at least the following grounds:

**I. The Debtor's Disclosure Statement Does Not Contain "Accurate Information"**

11 U.S.C. § 1125(a)(1) requires that a debtor's disclosure statement "contain "adequate information" in sufficient detail as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's financial records." 7 <u>Collier on Bankruptcy</u> at ¶ 1125.01[2], at p. 1125-5 (16th ed., rev. 2009). "Courts determine adequacy of a disclosure statement on a case-by-case basis, with the following as a partial yardstick against which the adequacy of disclosure may be measured:

(1) The circumstances that gave rise to the filing of the petition;

(2) A complete description of the available assets and their value;

(3) The anticipated future of the debtor;

(4) The source of the information provided in the disclosure statement;

(5) A disclaimer, which typically indicates that no statements or information concerning the debtor its assets or securities are authorized;

(6) The condition and performance of the debtor while in Chapter 11;

(7) Information regarding claims against the estate;

(8) A liquidation analysis setting forth the estimated return the creditors would receive under Chapter 7; and

(9) The accounting and valuation methods used to produce the financial information in the disclosure statement.

In Re: Keisler, 2009 Bankr. LEXIS 1814 (E.D. Tenn. 2009); See also In Re: Scioto Valley Mortgage Corp., 88 B.R. 168 (S.D. Ohio 1988). "Where inaccuracies are so numerous or significant that creditors or interest holders can no longer make an informed judgment about whether to accept or reject the proposed plan or reorganization, approval of the disclosure statement must be denied." In Re: Cardinal Congregate, 121 B.R. 760, 766-767 (S.D. Ohio 1990). Here, as set forth in more detail below, the inaccuracies are so numerous that any creditor seeking to effectively evaluate the proposed plan cannot make an informed decision. Consequently, approval of the Debtor's Disclosure Statement must be denied as a matter of law.

### A. The Financial Data and Accounting Methods of the Debtor are Without any Factual Basis

"Courts have emphasized that disclosure statements must contain factual support for any opinions contained therein since opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions." 7 Collier on Bankruptcy at ¶ 1125.02[2], at p. 1125-11 (16th ed., rev. 2009). Such factual support is clearly necessary in the financial disclosures provided by the Debtor. Here, there is no factual basis for the financial data presented by the Debtor.

As part of the Debtor's Disclosure Statement, the Debtor filed its Fiscal Year 2012 Estimated Cash Projections as Exhibit 3. In evaluating the financial disclosures, the Orchestra

Musicians performed a comparative analysis of the projected figures with the actual figures from 2010 and 2011 of the Debtor through a spreadsheet, a true and correct copy of which is attached hereto as **Exhibit A** and is incorporated herein by reference.

In reviewing the proposed cash projections set forth by the Debtor for the fiscal year 2012, there are numerous, unexplained, differences in the financial projections of the Debtor from previous years. What is even more troublesome is that such projections are without any explanation or basis for such large discrepancies. It is the Orchestra Musicians' position that the Disclosure Statement of the Debtor cannot be confirmed based on such conjecture.

As seen in Exhibit A, the financials are broken down into two major categories: 1) Income; and 2) Expenses.

The Income Section is further subdivided into nine subcategories: 1) ticket, education and miscellaneous sales income; 2) runout income; 3) contract income; 4) investment income; 5) Fund for the Arts Income; 6) Contributed Income; 7) Sponsor Income; 8) Government Grant Income; and 9) a total of all of the categories. Together, categories one through five represent "earned income" and categories six through eight represent "contributed income".

As seen in Exhibit A, the differences between the fiscal years 2011 and 2012 in each category are significant.[1]

For the fiscal year 2011, there was $926,946 in ticket, education and miscellaneous income. For the fiscal year 2012, there is a proposed decrease in ticket, education and miscellaneous income to $596,000. Such totals are a decrease of 35.7% from 2011 to 2012. What is even more staggering is that such proposal is a decrease of 51% from the 2010 income of $1,178,722.

---

[1] The figures used in Exhibit A are rounded figures that are rounded to the nearest dollar for calculation purposes.

For the fiscal year 2011, there was $108,000 in income from runouts. For the fiscal year 2012, there is proposed decrease in income from runouts to $90,000. Such figures represent a decrease of income from runouts of 16.7%.

For the fiscal year 2011, there was $466,000 in contract income. For the fiscal year 2012, there is proposed decrease in contract income to $390,000; a 16.3% decrease.

For the fiscal year 2011, there was $664,945 in investment income. For the fiscal year 2012, there is a proposed decease in investment income to $90,000. Such differences represent an 86.5% decrease in investment income.

For the fiscal year 2011, the Orchestra received $1,432,288 in income from the Fund for the Arts. The proposed decrease in Fund for the Arts income in 2012 is $1,167,504; an 18% decrease.

Overall, the total earned income from the fiscal year 2011 was $3,589,179. The projected earned income from the fiscal year 2012 presented by the Debtor is $2,333,504; a 35% decrease. This leads to the obvious question as to why the Debtor is expecting such a drastic decrease in "earned income" for the year 2012. The discrepancies are not explained in the Debtor's disclosure statement. The only real explanation available to the Orchestra Musicians to this point is that such figures are pure conjecture without any real factual support. Such projections, without any real financial basis, do not constitute "accurate information" as required by 11 U.S.C. § 1125(a)(1). Consequently, the Debtor's Disclosure Statement must not be approved as a matter of law.

Furthermore, while there were drastic decreases in "earned income" proposed by the Debtor for the fiscal year 2012, there are drastic increases in "contributed income" proposed for the fiscal year 2012.

For the fiscal year 2011, the Debtor had $406,360 in contributed income, otherwise known as donations. The proposed increase in donations set forth by the Debtor for the year 2012 is $1,340,000; a 229% increase. A significant sum considering the Debtor has provided no basis for suggesting such a tremendous increase in funding.

For the fiscal year 2011, the Debtor had $894,789 in sponsorship income. The Debtor proposes an increase of sponsorship income in 2012 to $1,215,000. Such difference represents a 35.8% increase in sponsorship income for the year 2012.

In the fiscal year 2011, the Debtor received $94,712 in government grants. The Debtor proposes an increase in government grants to $107,551. Such increase represents a 13.6% increase in government grant income.

Overall the Debtor received $1,395,861 in contributed income for the fiscal year 2011. The Debtor proposes in its 2012 budget that such figure increase to $2,662,551; a 91% increase from 2011. This again leads to the question as to why there is such a large discrepancy in "contributed income" from 2011 versus that which is projected for 2012. The Debtor does not provide any explanation in the Disclosure Statement for such a drastic increase. Again the only real explanation available to the Orchestra Musicians, and every other creditor, is that such figures are pure conjecture without any real factual support. Such projections, without any real factual, financial basis, do not constitute "accurate information" as required by 11 U.S.C. § 1125(a)(1). Consequently, the Debtor's Disclosure Statement must not be approved as a matter of law.

The third major category analyzed was expenses. The expenses were broken down into two sub-categories: 1) full-time musician salaries; and 2) administrative expenses.

In the fiscal year 2010, the full-time musician salaries constituted an expense of $3,219,174. In the fiscal year 2011, the full-time musician salaries constituted an expense of $3,140,350. The

projected full-time musician salaries for 2012 is proposed to be an expense of $2,270,000; a 30% decrease from 2010 and a 28% decrease from 2011. Consequently, the Debtor proposes a drastic decrease in musician salaries for the fiscal year 2012.

However, and quite curiously, the Debtor proposes an increase in administrative salaries and expenses for the fiscal year 2012. In the fiscal year 2011, administrative expenses and salaries totaled $1,460,000. The Debtor proposes that such figures increase in 2012 to $1,770,000; a 21% increase.

Again, the Debtor proposes figures for the 2012 fiscal year that appear to have no historical cost basis. Furthermore, the figures projected by the Debtor for the year 2012 appear to be nothing more than conjecture. This leads to the question of why there is such a drastic decrease in full-time musician salaries, yet an increase in administrative expenses for the following year. It seems fundamentally counterintuitive to increase administrative costs while reducing musician salaries.

Furthermore, there remains the issue that the Debtor does not have any musicians under a collective bargaining agreement. There is absolutely no basis to support the Debtor's contention that they can even hire an orchestra at the decreased salary of 21% from the previous year. "Opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions." 7 Collier on Bankruptcy at ¶ 1125.02[2], at p. 1125-11 (16th ed., rev. 2009). Consequently, without some proof from the Debtor it that can even find musicians willing to play at such a reduced sum, there is not sufficient accurate information to assess the validity of the Debtor's Disclosure Statement.

Additionally, the Debtor does not even disclose a 2012 schedule of events to show the means for which it attends to achieve such financial goals. It is difficult to even begin to evaluate the projected financial data of the Debtor without having some showing of potential

income streams for the upcoming year. Without such schedule, the Debtor's financial projections are illusory.

The bottom line is that without some explanation or basis, the 2012 projections are simply not "accurate information". Consequently, the Debtor's Disclosure Statement cannot be approved as it stands as a matter of law.

### B. The Assets of the Debtor are Undervalued

In the Disclosure Statement, the Debtor asserts that, "The following analysis concludes that each holder of an Allowed Claim, and the holders of Claims as a whole, would receive substantially less in liquidation than each will receive pursuant to the Plan." "This is because substantially all of the physical assets of the Debtor serve as collateral for the indebtedness owed to Chase, which indebtedness (in excess of $350,000, far exceeds the estimated liquidation value of the Debtor's physical assets ($207,000)." Debtor's Disclosure Statement, Page 20.[2]

However, the Debtor's physical assets are worth far more than the stated $207,000. After consultation with various experts, the Orchestra Musicians have found various discrepancies with the proposed liquidation values of the physical assets of the Debtor.

First, the music library is drastically undervalued. The Debtor's music library consists of approximately 1,100 classical music scores and 400 pops music scores. Based on the Debtor's estimates, each score is worth approximately $6.67. However, after consulting with various experts in the orchestra library field, the Orchestra Musicians have found that each classic music score is worth approximately $500-$1,000 per score and each pops music score is worth approximately

---

[2] It should be noted that they may be potential penalties associated with the Pension Fund that may increase the overall claims in this matter. However, the Pension Fund has counsel and Counsel for the Orchestra Musicians has not been retained to address such issue at this time.

$250 per score.[3] If the classical music scores were worth $500 per score at liquidation, such scores would total $550,000. If the classical music scores were worth $1,000 per score, such scores would total $1,100,000. If the pops music scores are worth $250 per score, such scores would total approximately $100,000. Consequently, it appears that the music scores are more likely worth anywhere from $650,000 to $1,200,000; much more than the $10,000 proposed by the Debtor.

Secondly, based on research information and belief, there are other discrepancies in the asset values of the Debtor. Based on such research, the Orchestra Musicians believe that The Baldontoni Violin is worth approximately $80,000. The American Drum Company Timpani is worth approximately $20,000. The Schiedemeyer 5.5 octave Celeste was purchased for $35,000 in 2001 and it is believed it is still worth approximately $30,000. The Ludwig Timpani is worth approximately $12,500. The Fox Contrabassoon is believed to be worth approximately $25,000. Consequently, it is the Orchestra Musicians' belief that such assets are worth approximately $745,250 to $1,190,000 more than estimated by the Debtor. Based on such figures, the Debtor's assets of instruments and equipment would total approximately $952,250 to $1,397,000. This would make the Debtor's assets, including cash on hand and accounts receivable, to be valued at approximately $952,250 to $1,524,886.

Based upon the Orchestra Musicians' calculations it appears that the Debtor is making far less in plan payments than the $952,250. Consequently, it is the Orchestra Musicians belief that the Debtor must compose an accurate liquidation test based on the true value of the Debtor's assets to meet the requirements of having "adequate information" in disclosing the true liquidation value of the Debtor.

Additionally, there remains the issue of the Trusts which benefit the Debtor. There is

---

[3] Some scores may be worth significantly more depending on the limited nature of the score and others may be

absolutely no discussion of what would happen to those Trusts in the event that there is a liquidation of the Debtor. There must be at least some analysis as to the effect of those trusts on the liquidation value for creditors to properly analyze their claims. Without such an analysis, there is no "adequate information" to properly address the contents of the Debtor's disclosure statement and Plan.

The Debtor further states in its Disclosure Statement that it "believes that the value of any distributions from the liquidation proceeds to each class of Allowed Claims in a Chapter 7 would be less than the value of distributions on a consolidating basis under the Plan because such distributions in a Chapter 7 case would not occur for a substantial period. It is likely that the distribution of the proceeds of the liquidation could be delayed for two years or more after the completion of such liquidation in order to resolve Claims and prepare for distributions." Debtor's Disclosure Statement, pages 28-29. Such statement by the Debtor is curious as to why it believes it would take significant time to liquidate the assets of the Debtor and that distribution would take such a significantly long period of time. The Debtor does not appear to have identified any real obstacles to such distribution. Consequently, the Orchestra Musicians have serious questions as to why such a distribution would take so long.

**C. The Debtor Discusses Changes to the Board and Bylaws Without Identifying such Changes**

The Debtor, in its Chapter 11 Plan, states in Section 6.4 that, "On the Effective Date, the charter and by-laws of the Reorganized Debtor shall be created or amended as necessary to (a) accommodate, facilitate and implement the provisions and purposes of this Plan of Reorganization, and (b) prohibit the issuance of non-voting equity securities as referenced by section 1123(a)(6) of the Bankruptcy Code to the extent necessary."

Based on such terms, it appears that the Debtor is going to amend its by-laws. However, the

---

worth slightly less.

Debtor does not even disclose which by-laws it intends to amend. Without identifying the specific by-laws it intends to amend, creditors must purely guess at potential amendment. Such is certainly outside the realm of "adequate information".

Additionally, the Debtor states in Section 6.5 that, "On or prior to the Effective Date, the Reorganized Debtor shall enter into employment agreements with such individuals as the Reorganized Debtor, in the exercise of its business judgment, deems necessary to the post-confirmation operations of the Debtor." Such statement is vague at best. It is not clear whether the Debtor is discussing administrative staff, musicians, or any other positions. It would be seem that the Debtor would need to at least identify what types of personnel it "deems necessary to the post-confirmation operations of the Debtor." Broad statements without support are simply not "adequate information". Based on the current terms, it is virtually impossible for creditors to effectively evaluate the effect of such employment contracts on the future of the organization without discussing the nature, cost, and terms of such proposed employment. Consequently, there is no question that the Debtor's Disclosure Statement is without "adequate information" as a matter of law.

## II. The Debtor's Disclosure Statement Does Not Meeting the Requirements of Bankruptcy 2002(b) and 3017(a)

Bankruptcy Rules 2002(b) and 3017(a) require that after the filing and service of a Disclosure Statement, a hearing is to be held upon "at least 28 days notice to….creditors…to consider the disclosure statement and any objections or modifications thereto." The Debtor filed its Disclosure Statement on February 30, 2011. The Court set June 13, 2011 as the deadline for objections to be filed with a hearing to be set on said objections for June 28, 2011.

It in its Disclosure Statement Enclosures, the Debtor stated, "Accompanying this Disclosure Statement are copies of the following:"

      Exhibit 1:     Plan of Reorganization
      Exhibit 2:     Scheduling Order
      Exhibit 3:     Balance Sheet
      Exhibit 4:     Projected Cash Flow Statement
      Exhibit 5:     Liquidation Analysis

Debtor's Disclosure Statement, Page 5.

While the Debtor stated that it was going to produce its Scheduling Order as part of the Disclosure Statement, no Scheduling Order was filed as an Exhibit to the Disclosure Statement. This Exhibit, according to the Disclosure Statement referenced to it, would provide information normally required in a disclosure statement by the Bankruptcy Code and Bankruptcy Rules. The Orchestra Musicians contend that the failure to produce such Exhibit denies creditors the benefits and notice requirements under the Bankruptcy Code and Bankruptcy Rules, effectively precluding a thorough analysis of the Debtor's projections and assumptions. Consequently, it is the Orchestra Musicians position that a hearing as to the Debtor's Disclosure Statement should not be held until such Exhibit is appropriately filed and the creditors are given proper time to object pursuant to Bankruptcy Rules 2002(b) and 3017(a).

### III. Conclusion

As seen above, the Debtor's Disclosure Statement does not contain "adequate information" regarding its proposed financial statements as well as the valuation of the collateral of the Debtor. The inaccuracies are so numerous and significant that creditors cannot make an informed judgment about whether to accept or reject the proposed plan of reorganization. Furthermore, approving the Debtor's Disclosure Statement would be in direct contravention of 11 U.S.C. § 1125. Consequently, the Orchestra Musicians respectfully request that Approval of the Debtor's Disclosure Statement be denied and that the exclusivity period be terminated.

**WHEREFORE**, The Orchestra Musicians, by counsel, respectfully moves the Court to

deny approval of the Disclosure Statement of the Debtor.

        **MORGAN & POTTINGER, P.S.C.**

        BY: __s/ Timothy A. Schenk___
        Timothy A. Schenk
        601 West Main Street
        Louisville, Kentucky 40202
        502.560.6731 (Telephone)
        Counsel for the Orchestra Musicians

## **CERTIFICATE**

   I hereby certify that this Objection and tendered Order were mailed, first class and postage pre-paid, this 13th day of June, 2011, to all those to whom notice is not electronically mailed by the Court, as indicated on the Court's Notice of Electronic Filing.

        _____s/ Timothy A. Schenk_____
        Timothy A. Schenk