## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| THE LOUISVILLE ORCHESTRA, INC., | ) |
| Debtor. | ) Case No. 10-36321 |
| | ) |
| | ) |
| _____ | ) |

## OBJECTION OF AMERICAN FEDERATION OF
## MUSICIANS AND EMPLOYERS' PENSION FUND TO THE
## FIRST AMENDED PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR

The Musicians and Employers' Pension Fund (the "Pension Fund"), by and through its undersigned counsel, hereby objects to the First Amended Plan of Reorganization (the "Amended Plan," Docket No. 201)[1] filed by The Louisville Orchestra, Inc. ("LOI" or the "Debtor"). The Amended Plan does not, as a matter of law, meet the standards for confirmation set forth in sections 1123 and 1129 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") in that, among other things, the Amended Plan: (1) is not feasible and fails to provide adequate means for its implementation because it is premised on LOI operating as an ongoing orchestra but contains no evidence that musicians will be performing under any terms or of sufficient funding (either from donations, a bank or other lending source) to cover operating expenses in the ordinary course of business or to make payments under the Amended Plan; and (2) was not filed in good faith and is not in the best interests of creditors, given the failure of the Debtor to pursue available assets of the estate, including potential causes of action against, among others, insiders, the LOF, and the Trust (as defined below). In addition, to the extent this Court confirms the Amended Plan, this Court should nevertheless modify the

---

[1] Each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in the Amended Plan.

releases contained therein to eliminate releases of any claims the Pension Fund may have against the Debtor's officers and directors. Finally, rather than vest in the reorganized Debtor all of the Debtor's Causes of Action and Avoidance Actions, this Court should carve out of the Debtor's estate and convey to a liquidating trust for the benefit of the Debtor's unsecured creditors all Causes of Action and Avoidance Actions, so that all potential Causes of Action and Avoidance Actions may be investigated and prosecuted. In support of its objection, the Pension Fund respectfully states as follows:

## INTRODUCTION

1.     The Amended Plan roughly outlines LOI's proposed strategy for reorganization but fails to explain how that reorganization will work and, thus, runs afoul of 11 U.S.C. § 1129(a)(11) (requiring that confirmation of the plan is not likely to be followed by liquidation or further financial reorganization); 11 U.S.C § 1129(a)(3) (requiring that a plan be filed in good faith); and 11 U.S.C § 1123(a)(5) (requiring that a plan provide adequate means for its implementation). Specifically, neither LOI's amended Disclosure Statement (the "Amended Disclosure Statement," Docket No. 200) nor the Amended Plan describes how LOI intends to generate the cash flow necessary for day-to-day operations after LOI's proposed emergence from chapter 11 or to fund the distributions required under the Amended Plan. (*See* Am. Discl. Statement at § IV.A.)

2.     As discussed in greater detail below, "[a]ccording to the Debtor's projections, the Debtor will generate sufficient cash flow through donations, grants and ticket sales to fund the payments provided for by the [Amended] Plan." (*Id.*) Yet there is no evidence of a collective bargaining agreement ("CBA") between LOI and its musicians, or any explanation of how LOI proposes to confirm that there will be musicians to provide performances and generate ticket revenue. There is no indication in the Amended Plan of who the Debtor's musicians will be,

under what terms such musicians will play, whether there are any contracts or agreements in place to insure that musicians will perform or how the orchestra will function (with what musicians, at what cost, and the source of any funding) the reorganized LOI is scheduled to open its 2011 season in September 2011. Indeed, it is the Pension Fund's understanding that there is currently no CBA or even an interim agreement in place pursuant to which the musicians would continue to perform with LOI. (*See* Docket No. 207 at 2.) Likewise, there is no explanation in the Amended Disclosure Statement or the Amended Plan for LOI's fundraising projections, which is especially troubling in light of LOI's well-documented and long-term difficulty with fundraising in the years before LOI filed for bankruptcy. For this reason alone, the Amended Plan should not be confirmed.

3.      Despite the lack of detail in the Amended Plan regarding the basis for LOI's apparent expectation that it will be able to maintain cash flow adequate to fund its continued operations, the Amended Plan is structured to make payments to LOI's unsecured creditors over a period of three years. (Am. Plan at § 4.9.) As LOI's largest general unsecured creditor, the Pension Fund therefore stands to bear a significant portion of the risk that the planned reorganization will fail, a risk that seems particularly salient in light of the Amended Plan's failure to specify a thorough strategy for continuing operations as a reorganized entity.

4.      In addition, the Amended Plan is not confirmable pursuant to 11 U.S.C § 1129(a)(3) (requiring that a plan be filed in good faith). There are significant assets—specifically, assets held in the name of the Louisville Orchestra Foundation ("LOF") and the Louisville Orchestra, Inc. Endowment Fund Trust (the "Trust")—that should be, but are not, treated as property of the estate. It appears that the LOF holds approximately $7.7 million in assets and the Trust holds approximately $1.2 million in assets. The factual record available in

this matter indicates that these funds should be made available to pay LOI's creditors. Furthermore, all Causes of Action against the LOF and the Trust should be pursued by a liquidating trustee for the benefit of all creditors.

## FACTUAL BACKGROUND

5.      Prior to December 3, 2010, the date on which LOI filed its chapter 11 petition (the "Petition Date"), LOI was a participant in the Pension Fund[2] pursuant to the terms of a CBA between LOI and the Louisville Federation of Musicians, Local 11-637, American Federation of Musicians (the "Union"), which CBA expired on May 31, 2011. Pursuant to the terms of the CBA, LOI was obligated to make pension contributions to the Pension Fund on behalf of LOI's employees.

6.      In November 2010, on account of LOI's pre-Petition Date failure to make certain payments to the Pension Fund, the Pension Fund terminated LOI's participation in the Pension Fund in accordance with federal statute, thereby giving rise to LOI's withdrawal liability to the Pension Fund under ERISA (the "Withdrawal Liability Claim").[3]  A withdrawal liability claim accrues when a contributing employer permanently ceases to have an obligation to contribute

---

[2]      The Pension Fund is an "employee pension benefit plan" within the meaning of section 3(2)(A) of the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("ERISA"), 29 U.S.C. § 1002(2)(A), and a non-profit "multi-employer plan" within the meaning of section 3(37) of ERISA, 29 U.S.C. § 1002(37), operated in accordance with a trust agreement under ERISA. The Pension Fund was established pursuant to section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). All contributions received by the Pension Fund (including those contributions made by LOI) are used for the exclusive purpose of providing pension benefits to current and former musicians across the country who are beneficiaries of the Pension Fund and paying the Pension Fund's administrative expenses.

[3]      Withdrawal liability is a statutory creation of Congress. The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") was enacted as an amendment to the Employee Retirement Income Security Act of 1974 "and was intended, in large part, to discourage employers from withdrawing from multiemployer pension plans and, thus, leaving those plans with unfunded liabilities." *Trs. of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020, 1021 (3d Cir. 1988). In essence, MPPAA was enacted to further protect employees who participate in multiemployer plans to allow them to receive their anticipated retirement benefit. Section 1382 of ERISA requires that a multiemployer fund (such as the Fund) assess and collect withdrawal liability as provided in sections 1381 and 1399 of ERISA. The employer is liable for its share of the pension plan's unfunded vested benefits as calculated at the time of withdrawal. 29 U.S.C. §§ 1381, 1383, 1391; *Concrete Pipe & Prods of Cal., Inc.. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 609 (1993).

under the pension plan. 29 U.S.C. § 1383 (providing that "a complete withdrawal from a multiemployer plan occurs when an employer . . . permanently ceases to have an obligation to contribute under the [pension] plan . . ."). The purpose of withdrawal liability is to "ensure that employers [do] not avoid their obligation to provide a promised benefit by withdrawing, thereby hurting their employees and the entire pension fund's health." *In re Marcal Paper Mills*, *Inc.*, No. 09-4574, __ F.3d __, 2011 U.S. App. LEXIS 12109 at *4 (3d Cir. June 16, 2011).

7.     On May 30, 2011, LOI filed its Disclosure Statement Pursuant to section 1125 of the Bankruptcy Code with Respect to Plan of Reorganization (the "Initial Disclosure Statement," Docket No. 147) and Plan of Reorganization dated May 30, 2011 (the "Initial Plan," Docket No. 148). Neither the Initial Disclosure Statement nor the Initial Plan addressed the Pension Fund's Withdrawal Liability Claim or the Debtor's proposed treatment of the Withdrawal Liability Claim. On June 3, 2011, on a telephone conference between counsel for the Pension Fund and for LOI, counsel for the Pension Fund asked the Debtor's counsel for LOI's position with respect to the Withdrawal Liability Claim. On June 6, 2011, as follow up to that telephone conference, counsel for LOI confirmed via electronic mail to counsel for the Pension Fund that the "Debtor intends to resume contributions to the Pension Fund as soon as the new CBA is reached."[4]

8.     Based on the formula set forth in section 4211(c)(3) of ERISA, the Pension Fund computed LOI's withdrawal liability to be in the amount of $3,185,668.75. On June 14, 2011, the Pension Fund filed a proof of claim (Claim No. 84; on June 22, 2011, the Pension Fund amended the proof of claim), which includes the Withdrawal Liability Claim and a summary of

---

[4]     The Pension Fund's pre-Petition Date termination of LOI from participation in the Pension Fund is not necessarily fatal to LOI's future participation in the Fund. The Pension Fund's trustees have in the past agreed to reinstate retroactively employers they have terminated due to delinquency upon such employers becoming current in their contributions, and the trustees could theoretically agree to do the same with LOI in this case. Thus, if LOI and the Union were to agree upon a CBA, which preserved LOI's present obligations to the Pension Fund and the trustees were to reinstate LOI into the Pension Fund, the trustees could take the position that there was no withdrawal, thus eliminating the Withdrawal Liability Claim.

the Pension Fund's calculation thereof. On account of the Withdrawal Liability Claim, the Pension Fund is the largest general unsecured creditor (and, indeed, the largest creditor) of LOI by a significant amount.

9.	On June 28, 2011, at the hearing on the Initial Disclosure Statement, LOI and the Union, with the Court's consent, agreed to participate in mediation with an eye toward resolving their labor disputes and entering into a new CBA.

10.	On July 15, 2011, LOI filed its Amended Disclosure Statement and Amended Plan. In the Amended Disclosure Statement, LOI "disputes liability for the withdrawal liability portion of the Pension Fund's claim" but nevertheless provides contingent treatment for the Withdrawal Liability Claim in the Amended Plan. (*See* Am. Discl. Statement at § III.D8.) LOI classifies the contingent Withdrawal Liability Claim in class 9, which consists of "Allowed General Unsecured Claims." (*See* Am. Plan at § 4.9.) The Amended Plan provides that holders of "Allowed General Unsecured Claims," including the Pension Fund, will receive either an "aggregate amount equal to 50% of their claim to be paid quarterly over a period of 3 years without interest" or a *pro rata* share of $92,500 paid in quarterly installments over a period of three years without interest, if the Withdrawal Liability Claim is allowed in whole or in part. (*See id.*) The Pension Fund is by far the largest creditor in this class: the total value of claims in this class is $185,000 not including the Withdrawal Liability Claim or $3.335 million including the Withdrawal Liability Claim (of which the Pension Fund's claim is approximately $3.186 million). (*See* Am. Discl. Statement at § IV.C.)

11.	After the reorganization, the Amended Plan anticipates that the Debtor will continue operations with its management largely intact. For example, the Board of Directors of the reorganized Debtor shall be the same as the Board of Directors of the Debtor. (Am. Plan at §

6.2.)  Likewise, the reorganized Debtor will retain Robert Birman, current Chief Executive Officer of LOI, as its Chief Executive Officer.  (*Id.* at § 6.3.)

12.     With respect to releases, the Amended Plan provides that it is "in full and final satisfaction, settlement and release as against the Debtor and the Debtor officers, directors and counsel (collectively, "*Exculpated Persons*") of any debt or Cause of Action relating to the Debtor or any such Entity's involvement therewith, as applicable, that arose before the Effective Date and any debts of any kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, and all Claims and Interests of any nature, relating to the Debtor or any such Entity's involvement therewith, including any interest accrued thereon, on and after the Petition Date…." (Am. Plan at § 10.3.)  The Amended Plan also provides that:

> the Debtor, the Reorganized Debtor and all holders of Claims do, and are hereby deemed to, release unconditionally, as applicable, the officers, directors and attorneys, and each of their respective successors, executors, administrators, heirs and assigns…from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action or liabilities whatsoever, relating to the Debtor or any such Entity's involvement therewith, whether known or unknown, foreseen and unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date, except for fraud or intentional or willful misconduct as finally determined by the Bankruptcy Court.

(*Id.*)  All such claims are permanently enjoined.  (*Id.*)

13.     As indicated above, the Amended Plan further provides that all Causes of Action belonging to the Debtor, among other assets, shall vest in the reorganized Debtor once the reorganization is complete.  (Am. Plan at § 6.1.)  In addition, the Amended Plan provides that the reorganized Debtor shall have the sole right to prosecute, compromise, and release all causes of action of the Debtor's estate under sections 542 through 549 of the Bankruptcy Code—defined as "Avoidance Actions."  (*Id.* at § 11.)

**ARGUMENT**

I.     **The Amended Plan Is Not Confirmable Because It Is Not Feasible as Required by Section 1129(a)(11) of the Bankruptcy Code.**

     A.     **Legal Standard**

14.     Section 1129(a)(11) of the Bankruptcy Code requires a finding that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor.…" 11 U.S.C. § 1129(a)(11).  Under this statutory requirement, bankruptcy courts have a responsibility to examine a plan or reorganization carefully "to determine whether it is workable and has a reasonable prospect of succeeding." *Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1004 (E.D. Va. 1994); *In re View Cleveland LLC*, Case No. 09-55035, 2010 Bankr. LEXIS 4805, at *3-4 (Bankr. N.D. Ohio Oct. 25, 2010).  The debtor bears the burden of demonstrating the feasibility of the plan.  *Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C.* (*In re Save Our Springs (S.O.S.) Alliance, Inc.*), 632 F.3d 168, 172 (5th Cir. 2011).

15.     To demonstrate the feasibility of a plan of reorganization, the plan proponent must "show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan."  *S&P, Inc. v. Pfeifer,* 189 B.R. 173, 183 (N.D. Ind. 1995) (internal citations omitted).  Sheer speculation is not sufficient to make the required showing; corroborating facts demonstrating the ability to raise funds is required.  *Repurchase Corp. v. Bodenstein* (*In re Repurchase Corp.*), No. 05 C 7075, 2008 U.S. Dist. LEXIS 23504 (N.D. Ill. Mar. 24, 2008) (affirming district court's denial of proposed plan where no evidence was offered that the plan had a reasonable chance of succeeding).

16.     In addition, courts have noted that, when there is little margin for error in a plan, that plan may not be feasible because many factors are out of the control of the plan proponent,

which can shift risk of default to the creditors. *In re View Cleveland LLC*, 2010 Bankr. LEXIS 4805, at \*16 (Bankr. N.D. Ohio 2010). Thus, where a plan is premised on making long-term payments to creditors, courts require a stricter proof of feasibility. *Id.* (holding that plan is not feasible where unsecured creditors would receive payments in the fifth year of the plan), citing *In re Agawam Creative Mktg. Assocs., Inc.*, 63 B.R. 612 (Bankr. D.C. Mass. 1986). Courts have required stricter proof of feasibility under these circumstances because a primary concern is the company's "ability to meet its obligations as they mature." *Id.* Here, the Amended Plan provides that holders of "Allowed General Unsecured Claims" will receive an "aggregate amount equal to 50% of their claim to be paid quarterly over a period of 3 years without interest" or a *pro rata* share of $92,500 paid in quarterly installments over a period of three years without interest, if the Withdrawal Liability Claim is allowed in whole or in part. (*See* Am. Plan at § 4.9 (emphasis added).) Accordingly, in this case, if the reorganization is not successful, the Class 9 general unsecured creditors, whose claims will not be paid in full until three years after the reorganization is complete, bear some risk of a possible default. The Debtor must therefore meet the requirement of "stricter proof" of feasibility in this case.

**B. The Amended Plan Does Not Provide Evidence of Sufficient Funding of the Debtor as a Going Concern.**

17. According to LOI's Amended Disclosure Statement, its historical funding for the annual operating budget has been as follows: ticket and subscription revenues (16%-24%); corporate donations and sponsorships (12%-17%); the LOF and the Trust; FFA; and bank debt. (Am. Discl. Statement at § II.D.) The Amended Plan is not confirmable because it fails to provide any concrete evidence that LOI's key historical funding sources will continue to be available to LOI to funds its day to day operations after the reorganization and therefore has no reasonable probability of success.

18. With respect to LOI's future projections, the Amended Disclosure Statement provides projected cash flow statements and indicates that the those projections should be read in conjunction with the "selected financial data appearing in section V." (Am. Discl. Statement at § VI.) Section 5, however, consists solely of a statement that: "A copy of the Debtor's current balance sheet is attached hereto as **Exhibit 3**, and hereby incorporated herein as though fully set forth." (*Id.* at § V.) Accordingly, the Amended Disclosure Statement fails to provide any basis for the financial projections made or any expectation that those projects are reasonable and supportable.

### 1. There Is No CBA in Place with the Orchestra Musicians.

19. The FY 12 Estimated Cash Projection attached to the Amended Disclosure Statement (Docket No. 200-4) estimates that, between June 2011 and May 2012, LOI will obtain $596,000 in subscription revenue for 2012 and $350,000 in subscription revenue for 2013. The Projection does not, however, make clear how the reorganized Debtor will achieve financial solvency. For example, LOI had a regular concert schedule before the Petition Date and, yet, was unable to make ends meet through ticket sales and donations. If the Debtor suggests that it can solve its financial problems by continuing operations with a smaller orchestra, this is a non-starter, as there is no indication that its musicians will agree to play on those terms.

20. Nor is there any reasonable expectation at the present time that the reorganized Debtor will continue operations with its full orchestra. As set forth above, there is currently no CBA between the Union and LOI. Furthermore, the Debtor has provided no evidence that the Union or its musicians will consider one-off contracts, by which musicians would agree to pay-for-performance for single events. As a result, there is no reasonable expectation that LOI will be able to hire Union members to perform, much less on an ad hoc basis to supplement a smaller permanent orchestra of the type and stature that existed previously. (*See* Ex. A (11/17/10 Email

(LOI CEO Robert Birman recognizes that an agreement with the Union for programs and services "will be required, at the very minimum, to resume healthy and functional operations").) This Court previously noted the consequences that might befall LOI, were it to move forward without its musicians: subscribers would cancel their subscriptions, there would be a loss of goodwill by "almost everyone involved," and there would be a risk of losing sponsorships. (Docket No. 92 at 5:2-22.)

21.     The Debtor's stated "expectation" that it will be able to find musicians to enter into one-off contracts, without any corroboration or a single contract provided as evidence of the reasonableness of this expectation, is not sufficient to render the Amended Plan feasible. *In re Trans Max Techs., Inc.*, 349 B.R. 80 (Bankr. D. Nev. 2006). In *Trans Max*, the debtor failed to offer evidence "of any binding contractual commitments with investors" but, rather, relied on assurances that the debtor "believed" it could find a joint venturer. *Id.* at 93-94. The *Trans Max* court denied that plan of reorganizations for several reasons, including lack of feasibility. Similarly here, the Amended Plan is not confirmable simply because the Debtor has stated its belief that it will be able to find other musicians. *See also In re Repurchase Corp.*, 332 B.R. at 339, 343 (Bankr. N.D. Ill. 2005) (plan not feasible where testimony of the debtor regarding ability to obtain financing "amounted to nothing more than sheer speculation and wishful thinking"); *In re Prudential Energy Co.*, 59 B.R. 765, 767 (Bankr. S.D.N.Y. 1986) (court refused "to abdicate its statutory duty [to section 1129(a)(11)]" in favor of unsupported statements of corporate officers that were "confident" in the projections.). The lack of corroboration for the stated expectation that LOI will be able to find musicians to honor its performance schedule is particularly glaring in light of the "stricter proof" to which the Debtor is held in this case, as a result of its intent to make payments to certain unsecured creditors over a period of several years.

Finally, to the extent the reorganized Debtor might be able to enter into contracts pursuant to which some musicians would perform and enable LOI to maintain a regular schedule for the 2011-2012 season, there is no evidence of what those contract terms might be or whether the musicians would prompt sufficient ticket sales to support LOI's operations.

**2. The Amended Plan's Reliance on Receipt of Donations Is Not Sufficiently Specific to Render the Amended Plan Feasible.**

22. As set forth above, the Amended Disclosure Statement makes plain that LOI has historically relied on charitable donations to extricate itself from its financial crises. The Amended Plan projects that LOI will rely on donations for the success of the reorganized Debtor. (Am. Discl. Statement at § IV.A ("[a]ccording to the Debtor's projections, the Debtor will generate sufficient cash flow through donations, grants and ticket sales to fund the payments provided for by the [Amended] Plan.").) Indeed, the FY 12 Estimated Cash Projection attached to the Amended Disclosure Statement (Docket No. 200-4) anticipates that, between June 2011 and May 2012, LOI will obtain $924,825 in contributions or grants and $410,000 in capital campaign, challenge, and anonymous gifts. It is absolutely clear that the orchestra cannot successfully raise funds absent an orchestra and a continuing concert schedule.

23. To the extent that the Amended Plan is premised on LOI's intent to collect donations in the future in order to continue operations (which, as set forth above, raises significant questions about how the reorganized Debtor intends to maintain a concert schedule), this is not sufficient to merit Plan confirmation. *See Save Our Springs*, 632 F.3d at 172. It is not enough for LOI to show merely that it was able to obtain donations before the Petition Date, as past fundraising efforts are no assurance of future fundraising success. *Id.* As explained below, LOI has historically faced fundraising problems and uncertainty about its future, including its future size, quality, and composition. In addition to pointing to past fundraising campaigns, a

plan of reorganization relying on donations must also give some "reasonable assurance" of future fundraising success. *Id.*

24.     Here, there is ample evidence that the Debtor has repeatedly found itself in financial distress and been unable to extricate itself from that state. LOI acknowledges that it has been in financial crisis several times, including in 1997, 2003, and 2006. (Am. Discl. Statement at § II.C.) Each time LOI found itself in financial crisis, it was able to "survive" due to "unanticipated bequests and/or extraordinary intervention by one or more donors." (*Id.*) In other words, LOI <u>consistently</u> relies on charitable donations to make its continued operation possible but <u>consistently</u> finds itself in financial distress. LOI's fundraising history makes clear that it had regular difficulty in raising sufficient funds to make its continued operations possible. For example, this issue was raised repeatedly in board meetings:

> Rob Birman gave a brief update on the Capital Campaign. Individuals are still being approached but are not willing to make a pledge. We are almost at the point of needing to take a break in order to keep the attitude positive about the campaign.
> (Ex. B (12/16/2009 Louisville Orchestra Finance Committee Minutes).)

> Linda Wardell commented that LO is used to being saved so many times through bequests or other significant one-time gifts that most people probably don't realize our situation. Hard and uncomfortable decisions are going to have to be made in order for LO's situation to change.
> (Ex. C (1/20/2010 Louisville Orchestra Finance Committee Minutes).)

> LO is running out of cash and many of our major donors have said they will not support the organization unless the business model changes. Major donors want to see a model that can be sustained long-term, no more one-time bailouts.
> (Ex. D (11/16/2010 Louisville Orchestra Finance Committee Minutes).)

Despite this, there is no explanation in the Amended Plan for why the reorganized Debtor expects to have more fundraising success. Moreover, neither the Amended Disclosure Statement nor the Amended Plan reflect that "the business model" has changed.

25.     There is also no evidence in the Amended Plan of the reorganized Debtor's ability to consistently secure the sort of "unanticipated" and "extraordinary" donations that, historically, enabled LOI's survival.  To the contrary, Chuck Maisch, President of LOI's Board of Directors, stated in an October 26, 2010 letter that LOI typically relies on bequests, bailouts, and borrowing to survive financial crises.  (Ex. E (10/26/10 Ltr.).)  Its reliance on bequests was threatened, however, as LOI had not received a "sizable bequest" for over two years.  (*Id.*)  Mr. Maisch further noted that LOI has had an operating deficit "in each and every year throughout the past decade."  (*Id.*)  Mr. Maisch stated that, although its major stakeholders provided emergency bailouts multiple times during that period, more recently, LOI had approached "major supporters and the organization's most significant donors" and had been met with unwillingness to continue offering such bailouts.  (*Id.*)

26.     As Mr. Maisch further stated on November 1, 2010:

> Unless we are to believe that all of the boards of this orchestra over the past 30 years (including our current board) has done a significantly sub-standard job of fundraising, <u>our community has spoken regarding the sustainable level of support that we can achieve.  This level has consistently been about $1 MM below the level necessary to support our cost structure</u>.  A one-time, cooperative fundraising effort could certainly generate some level of additional financial support.  However, there is not reliable empirically-based data or even visceral indication that such an effort could help us achieve the funding necessary to sustain the current season as we need an additional $1.6 MM starting immediately.  We would then be faced with exactly the same problem for the next season.

(Ex. F (11/2/10 Memo. (emphasis added)).)  There is no indication in the Amended Plan that costs have been cut by the amount necessary to obtain sustainable support from LOI's donors.

27.     Were LOI to reorganize without any reasonable expectation of being able to maintain a concert schedule due to its lack of musicians, this would thwart future fundraising efforts by undermining the goodwill enjoyed by LOI.  (*See* Docket No. 92 at 9:26-10:5.)  As this Court has previously held: "If the orchestra is not going to perform, it's not going to play music,

very well the fund for the orchestra may say you're not playing music, I'm not giving you any money. That would be $200,000 or $300,000 or $400,000 right there." (*Id.*) Beyond this, there is also a serious risk that LOI will compromise its good will by failing to keep its performance schedule. (*Id.* at 10:6-12.)

28.     Without corroboration of the Debtor's ability to obtain projected donations after reorganization, the Amended Plan is not confirmable. *See In re Arts Dairy, LLC*, 432 B.R. 712, 717-718 (Bankr. N.D. Ohio 2010) (court did not confirm plan on grounds that it was not feasible because the plan did not provide for an infusion of new capital to reduce the long-term costs of the debtor's infrastructure).

### 3.     There Is No Indication that LOI Will Acquire a Bank Loan to Supplement its Operating Budget.

29.     The funding for LOI before the Petition Date relied, in part, on bank debt to facilitate LOI's operations. (Am. Discl. Statement at § II.D.) In other words, LOI was unable to continue operations based alone on ticket and subscription revenues, donations, and sponsorship but, rather, was required to take out a bank loan in order to function. Despite this, the Amended Disclosure Statement does not contemplate acquisition of a bank loan to supplement LOI's finances: there is no evidence of a loan in place or an agreement to provide financing. (*See* Docket No. 200-4.) Nor does it seem likely that LOI would be able to obtain a significant loan, in light of the fact that LOI's bank debt is compromised in the Amended Plan. As a result, the Amended Plan's feasibility is called into question for the additional reason that the full scope of funding available to the Debtor pre-Petition Date will not be available to the reorganized Debtor.

**II.** **The Amended Plan Is Not Confirmable Because It Is Not Filed in Good Faith as Required by Section 1129(a)(3) of the Bankruptcy Code And Is Not in the Best Interest of Creditors.**

    **A.** **The Debtor Has Significant Assets Held in the Name of the Louisville Orchestra Foundation, Inc. and the Louisville Orchestra, Inc. Endowment Fund Trust Should Be Part of the Estate.**

30.    Section 541(a) of the Bankruptcy Code broadly defines property of the estate as: "all legal or equitable interests of the debtor in property as of the commencement of the case" and "wherever located and by whomever held." 11 U.S.C. § 541. Because "prompt payment of creditors is a primary objective of a Chapter 11 reorganization...the failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith …." *Crestar Bank*, 165 B.R. at 1001; *see also Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp.* (*In re Big Rivers Elec. Corp.*), 233 B.R. 739, 751 (W.D. Ky. 1998) ("A debtor-in-possession owes a fiduciary duty to maximize the value of the estate to all its creditors.").

31.    Notably, courts in this jurisdiction employ a sliding scale test when evaluating whether a plan was proposed in good faith: "The greater the percentage of debt proposed to be paid, the stronger the presumption of good faith; the lesser the percentage, the more intense must be the inquiry of the Court into the issue of good faith." *In re Khan*, 34 B.R. 574, 576 (Bankr. W.D. Ky. 1983) (citation omitted). In this case, there is no dispute that, with respect to the Pension Fund's claims, the Debtor intends to pay a small proportion of the debt. If the Withdrawal Liability Claim is allowed, the Pension Fund and other Class 9 general unsecured creditors will receive at most three cents on the dollar for their claims, which represents $92,500 (the amount available to satisfy all general unsecured claims) divided by the approximate aggregate amount of all general unsecured claims: $3,335,000. (*See* Am. Discl. Statement, § IV.C.) If the Withdrawal Liability Claim is disallowed, the unsecured creditors in Class 9 will

recover fifty cents on the dollar for their claims. (*Id.*) The claims of the other unsecured creditors are similarly impaired: Class 5 (Chase deficiency claim) is to receive no recovery; Class 6 (FTB deficiency claim) is to receive a 90% recovery; Class 7 (TKC unsecured lease assumption cure claim) is to receive a 50% recovery; and Class 10 (convenience unsecured claims) is to receive a 50% recovery. (*Id.*) Even certain secured claims are impaired, with Chase expecting a 65% recovery on its secured claim of $270,000. (*Id.*)

32. The Amended Plan is not confirmable under the standard set by section 1129(a)(3) of the Bankruptcy Code because the record is replete with evidence that the funds available to LOF and the Trust should be made available to pay the creditors. As of May 31, 2010, LOI's Consolidated Financial Statements indicated that LOF held fair value investments worth approximately $7.7 million. (Ex. G (Audited Consolidated Financial Statements of LOI and Related Entity dated 5/31/10).) That same document indicated that the Trust held assets worth approximately $1.2 million. (*Id.*) The assets held by LOF and the Trust should be treated as property of the Debtor's estate because the Debtor has a legal or equitable interest in such assets.

33. As a practical matter, as set forth the Debtor's Amended Disclosure Statement, LOF and the Trust each regularly provide distributions to the Debtor. (Am. Discl. Statement at § II.D.3.) Under the terms of its agreement (the "Trust Agreement"), the Trust must make distributions to LOI of net income at least once a year, and "at such reasonable intervals as may be requested." (Ex. H (Trust Ag.) at Art. II, 2.1(b).) Furthermore, LOI's Investment Committee may "instruct the Trustees to distribute so much of the Fund's net appreciation, realized and unrealized, which is in excess of the Principal Donation (as defined herein) of the Fund." (*Id.* at Art. II, 2.1(c).) Likewise, LOF makes annual distributions in an amount equal to five percent of

the average fair market value of LOF's assets over the previous twelve quarters, and is empowered to provide additional distributions upon a vote of "at least four and no less than a majority of the Directors. . ." (Articles of Incorporation of The Louisville Orchestra Foundation, Inc. ("<u>LOF Art.</u>"), Docket No. 61-2 at Art. II(a)(2)(i-ii).)

34. Moreover, the corporate governance of those entities highlights their interconnectedness. For example, LOF's directors are elected by the Debtor. (Trust Ag. at Art. VI.) Furthermore, newly elected trustees of the Trust are required to be voting directors of LOI's board of directors. (Trust Ag. at Art. III(3.1).) In addition, individuals make donations to the Debtor, and, upon receipt of the funds, the Debtor transmits them to LOF. (Am. Discl. Statement at § II.D.3.)

35. Furthermore, LOI has, in the past, regularly received "bail outs" from the Trust. According to Community Foundation of Louisville, Inc.'s Complaint against LOI, between the years of 1993 and 2002, LOI received distributions from the Trust ranging anywhere from 5%-10%. (Docket No. 65-2 at Complaint for Declaratory Relief filed in *Community Foundation of Louisville, Inc. v. Louisville Orchestra, Inc.*, Civ. Action No. 02 CI 04737, ¶ 11.)) In 1991 and 1992 combined, LOI received distributions amounting to approximately $867,000 in excess of what was called for by the endowment agreement at the time. (*Id.*) Just last year, LOF's directors decided to advance the date for LOI's distribution by sixty days without any amendment of LOF articles of incorporation. (Ex. I (2/19/10 Email).)

**B.     There Is No Adequate Means of Implementation for the Amended Plan.**

36. To satisfy the requirement of section 1129(a)(3) that a plan be filed in good faith and merit plan confirmation, the Debtor must offer more than mere speculation about the source of funding for the Amended Plan and outline more than indefinite plans. *Crestar Bank*, 165 B.R. at 1003-04, quoting *In re Briscoe Enters., Ltd.*, 138 Bankr. 795, 807 (N.D. Tex. 1992) (additional

citations omitted). Instead, a plan of reorganization must "make reasonably specific provisions for an adequate means of implementation." *Id.* at 1004. This is the only way to ensure that both creditors and the Court have means and criteria to evaluate a plan of reorganization. *Id.* "In fact, it is extremely difficult, if not impossible, for a court to determine the validity of any claimed default unless the plan articulates with reasonable specificity the means for implementation." *Id.*

37. For the same reasons that the Amended Plan is not feasible (*See* Section I above), the Amended Plan cannot satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code. The Amended Plan provides for the reorganized Debtor to resume operations as an ongoing orchestra without any CBA with its musicians, but it is nowhere made apparent how LOI intends to do so. No detail has been provided regarding how performances will be made. To the extent LOI intends to supplement its subscription and ticket sale income, the Amended Plan is equally unclear regarding how the reorganized Debtor intends to raise these funds or why future fundraising efforts will be more successful than those it undertook in the past. This is particularly significant, in light of the absence of evidence that LOI has any orchestral musicians who will perform in future seasons or that the Debtor has changed its business model. Accordingly, the Amended Plan was not proposed in good faith and is unconfirmable for this reason as well.

III. **The Amended Plan Is Not Confirmable Because it Fails to Comply with Section 1123 of the Bankruptcy Code.**

38. To be confirmable, a chapter 11 plan must comply with specific requirements of section 1123(a)(5) of the Bankruptcy Code, which requires that a plan "provide adequate means for the plan's execution." 11 U.S.C. § 1123(a)(5). The LOI Plan is not confirmable because, as set forth below, the Amended Plan does not provide adequate means for its implementation. As an initial matter, as set forth above, the Projected Cash Flow Statement attached to the Amended

Disclosure Statement directs that it be read in conjunction with the "selected financial data appearing in section V." (Am. Discl. Statement at § VI.) Section 5, however, consists solely of a statement that: "A copy of the Debtor's current balance sheet is attached hereto as **Exhibit 3**, and hereby incorporated herein as though fully set forth herein. (*Id.* at § V.) As a result, the Amended Disclosure Statement provides no basis to contextualize or understand its financial projections.

39. To satisfy the requirements of section 112(a)(5), a plan of reorganization must provide "some means by which the debtor may repay its debts." *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985), disapproved on other grounds at *Toibb v. Radloff*, 501 U.S. 157, 160 (1991). Just as the Amended Plan is not feasible and was not filed in good faith because it fails to include adequate specificity regarding the means of its implementation (*see* Section I and Section II.B above), the Amended Plan is not confirmable because it does not satisfy section 1123(a)(5) of the Bankruptcy Code.

**IV. In the Alternative, if this Court Approves the Amended Plan, the Amended Plan Should Be Revised to Remove the Releases of the Pension Fund's Claims Against Any Non-Debtors and to Vest All Causes of Action in a Liquidating Trust After Reorganization.**

    **A. The Amended Plan Improperly Seeks to Release the Pension Fund's Potential Claims Against the Debtors' Officers and Directors.**

40. As set forth above, the Amended Plan purports to provide releases not only for LOI, as the Debtor, but also for its officers and directors. (Am. Plan at § 10.3.) The Amended Plan also provides that all holders of claims—including the Pension Fund—will be deemed to have unconditionally released any claims relating to the Debtor or their involvement with the Debtor against those officers and directors. (*Id.*) Finally, the Amended Plan purports to permanently enjoin such claims. (*Id.*)

41.     In the Sixth Circuit, such releases for the claims of non-consenting creditors against a non-debtor are appropriate only under limited circumstances:

> We hold that when the following seven factors are present, the bankruptcy court <u>may</u> enjoin a non-consenting creditor's claims against a non-debtor: (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) (emphasis added).  In *Dow Corning*, the Sixth Circuit found that there had not been an adequate showing to justify releases of a non-consenting creditor's claims against a non-debtor (there, the non-debtors included Dow insurers and shareholders).  *Id.* at 653 & 655.  Here, as in *Dow Corning*, the Debtor cannot make the showing necessary to justify releasing the claims of non-consenting creditors against the LOI officers and directors.  *See also In re SL Liquidating, Inc.*, 428 B.R. 799, 804 (Bankr. S.D. Ohio 2010) ("This is a liquidating chapter 11 case and the Debtors' directors and officers are facing three lawsuits by two plaintiffs. There are no unusual circumstances. There is no basis to grant the dramatic measure of non-consensual third party releases.").

42.     Despite this, the Amended Plan seeks to release claims that the Pension Fund might have against LOI's officers and directors arising out of their conduct with respect to the Debtor.  At the current time, the Pension Fund has not had an opportunity to fully investigate the actions of these parties or whether there is factual basis for it to bring claims against any or all of

them. As a result, the releases set forth in the Amended Plan that extend to any claims the Pension Fund might have to the Debtor's directors and officers should not be implemented.

**B.** **Causes of Action and Avoidance Actions Should Vest in a Liquidating Trust for the Benefit of All Creditors, Rather than in the Reorganized Debtor.**

43. The Amended Plan also provides that all of the Debtor's Causes of Action, among other assets, shall vest in the reorganized Debtor once the reorganization is complete. (Am. Plan at § 6.1.) The Causes of Action that would vest in the reorganized Debtor include any claims LOI might have against third parties, such as claims against LOF, the Trust, or their managers. In addition, the Amended Plan provides that the reorganized Debtor shall have the sole right to prosecute, compromise, and release all causes of action of the Debtor's estate under sections 542 through 549 of the Bankruptcy Code—defined as "Avoidance Actions." (Am. Plan at § 11.) LOI's cash projections attached to the Amended Disclosure Statement, however, fail to reflect whether LOI ascribes any value at all to such causes of action (it appears that LOI does not).

44. The Bankruptcy Code requires that a Debtor take action to maximize the value of the estate for all of its creditors. *See Pacificorp Ky.*, 233 B.R. at 751. Similarly, when a corporation is insolvent, its creditors step into the shoes of the shareholders as the beneficiaries of corporate growth and increase in value. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 191 (Del. 2007). During a typical chapter 11 bankruptcy proceeding, a creditors' committee is formed to investigate and prosecute claims that might bring value to the Debtor's estate. *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 562 (3d Cir. 2003) (en banc) ("Section 1109(b) ... evinces Congress's intent for creditors' committees to play a vibrant and central role in Chapter 11 adversarial proceedings."); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994) ("The function of an official creditors committee is to...ensure that the

unsecured creditors' views are heard and their interests promoted and protected."). In this action, although discovery was conducted, it did not culminate in any actions brought to augment the value of the Debtor's estate from any party, including any Avoidance Action. Neither the Union nor the Musicians' Committee has the resources to have investigated such claims and neither may have a claim that could be satisfied by any recovery on account of such potential actions. Nor is there any evidence in the record that the Debtor investigated the factual basis for prosecuting any such claims: the Amended Disclosure Statement contains no explanation of any investigation, and no adversary proceeding was filed in connection with the Debtor's bankruptcy case. This indicates that the Debtor has not fully investigated available causes of action.

45. Significantly, in this case, the Debtor may actually have incentives <u>not</u> to fully investigate any such claims, as the reorganized Debtor will retain the same management as the Debtor currently has, including an identical Board of Directors and Chief Executive Officer. (Am. Plan at §§ 6.2-6.3.) As a result, there is currently no incentive for the Debtor to seriously consider, much less bring, an Avoidance Action or other Cause of Action in order to augment the estate, as such an action would merely entitle the creditors, rather than LOI, to reap the benefit of any such cause of action. Furthermore, as a reorganized entity, LOI will presumably continue to collaborate with many of the parties against whom it might pursue claims and, thus, LOI has an incentive to protect those individuals or entities.

46. Accordingly, Causes of Action and Avoidance Actions should not become the property of the reorganized Debtor, but, rather, should be placed into a liquidating trust for the benefit of the Debtor's estate. The Court should grant the Pension Fund, as the Debtor's largest unsecured creditor, the right to appoint a trustee of the liquidating trust responsible for investigating any such claims, and, to the extent such investigation uncovers viable claims,

prosecuting them. If such prosecution results in the recovery of funds, the money recovered will be placed in the liquidating trust and distributed *pro rata* to the Debtor's general unsecured creditors.

47.     To the extent the Court would find it useful, the Pension Fund will provide a liquidating trust agreement that has been adopted and confirmed in other bankruptcy cases, which can be used to provide a framework and model for this matter.

**WHEREFORE,** the Pension Fund respectfully requests that the Court enter an order denying confirmation of the Amended Plan or, in the alternative, striking the and granting the Fund such other and further relief as this Court finds just, proper and equitable.

Dated: August 9, 2011
      Louisville, Kentucky

*/s/  Ellen Arvin Kennedy, Esq.*
**DINSMORE & SHOHL LLP**
Co-Counsel for the American Federation of
Musicians and Employers' Pension Fund
Lexington Financial Center
250 West Main Street, Suite 1400
Lexington, Kentucky 40507
Attn:   Ellen Arvin Kennedy, Esq.
Telephone Number: (859) 425-1020
Facsimile Number: (859) 425-1099
Email:  ellen.kennedy@dinslaw.com

-and-

**PROSKAUER ROSE LLP**
Lead Bankruptcy and ERISA Counsel for
the American Federation of Musicians and
Employers' Pension Fund
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Attn:   Mark K. Thomas, Esq. &
      Peter J. Young, Esq.
Telephone Number: (312) 962-3550
Facsimile Number: (312) 962-3551
Email:  mthomas@proskauer.com
      pyoung@proskauer.com

-and-

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036-8299
Attn:   Richard J. Corbi, Esq.
Telephone Number: (212) 969-3000
Facsimile Number: (212) 969-2900
Email:  rcorbi@proskauer.com

-and-

**LOWENSTEIN SANDLER, P.C.**
Special Counsel for the American
Federation of Musicians and Employers'
Pension Fund
65 Livingston Avenue
Roseland, NJ 07068
Attn:   Sharon L. Levine, Esq.
        S. Jason Teele, Esq.
Telephone Number: (973) 597-2500
Facsimile Number: (973) 597-2400
Email: slevine@lowenstein.com
        steele@lowenstein.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on this the 9th day of August, 2011 either via the ECF System, which will send an electronic notice of filing to counsel of record and all parties having filed a request for notice.


*/s/  Ellen Arvin Kennedy, Esq.*
*Co-Counsel for the American Federation of*
*Musicians and Employers' Pension Fund*

1075/11131-036 current/24566406v9